ANNICE G. BARTEAU *v.* WILLIAM L. BARTEAU and others.

December 23, 1890.

**Action to Avoid Conveyances for Fraud—Decree Annulling Divorce.** *Held,* that the order of the trial court directing judgment vacating the decree of divorce between plaintiff and the defendant William L. Barteau, rendered in another action, was not within, or responsive to, any issue made by the pleadings or voluntarily tried by the parties in this action.

**Same—Fraud not Established.**—*Held, also,* that the evidence did not justify the findings of fact to the effect that the conveyances and transfers of plaintiff's property to defendant Mary Barteau by defendants William L. Barteau and Fairchild were a fraud on plaintiff.

Appeal by defendants from an order of the district court for Ramsey county, *Kelly,* J., presiding, refusing a new trial.

*E. F. Lane, Williams & Goodenow,* and *M. R. Tyler,* for appellants Barteau.

*Thompson & Taylor* and *Williams, Goodenow & Stanton,* for appellant Fairchild.

*Harvey Officer* and *Chas. N. Bell,* for respondent.

MITCHELL, J. The material allegations of the complaint in this action are that the plaintiff, while the wife of the defendant William L. Barteau, was the owner of a large amount of real and personal property, her husband acting for and representing her in the management, care, investment, and reinvestment of her money and property, and in the purchase of real estate on her account; that in June, 1884, she and her husband having agreed on a separation, it

was also mutually agreed that she should go to Europe for medical treatment, and that her husband should remain in St. Paul, and, as her agent, continue in the management of her property and business, and that, to enable him to do so, she executed to him a power of attorney authorizing him to collect and control her mortgages and other personal property, as he might deem best for her; that in pursuance of this arrangement she went to Europe in June, 1884, and continued to reside there until March, 1889; that while she was in Europe, and in the early part of 1885, her husband and the defendant Mary Barteau, (then Mary Bailey,) having entered into an adulterous intercourse with each other, combined and conspired together, and with defendant Fairchild, (to whom plaintiff, before her departure for Europe, had executed a power of attorney to execute conveyances of her real estate,) to cheat and defraud her out of her property, and to cause the same to be transferred to said Mary Bailey, to the end and with the intent that the defendant W. L. Barteau should procure a divorce from plaintiff, and then marry said Bailey, and thereby the two acquire and enjoy plaintiff's property. The complaint further alleges that, in pursuance of this combination and conspiracy, the defendant W. L. Barteau "pretended" to commence an action against the present plaintiff for a divorce, on the ground of wilful desertion; that she did not appear in or defend the action; that such "pretended" proceedings were had therein that on March 17, 1886, a "pretended" decree was entered dissolving the bonds of matrimony between her and her husband; that a few days thereafter William L. Barteau and Mary Bailey "went through the usual and legal forms of being married together, and have ever since cohabited together as man and wife;" that, in pursuance of the unlawful conspiracy to defraud plaintiff, the defendants William L. Barteau and Josiah Fairchild, pretending to act as her attorneys, fraudulently and without consideration conveyed and transferred all her real and personal property to Mary Bailey. The relief asked is that the plaintiff have judgment directing the defendants to account to her for all the property of hers that has thus come into their hands, and the proceeds thereof; also adjudging all of the property still standing in the name of Mary Bailey to be the property of plaintiff,

and that reconveyances thereof to her be directed; and that she have such other judgment and decree as may be just and proper in the premises. The court, in substance, found all the allegations of the complaint true, except those of fraud and conspiracy on part of the defendant Fairchild. As conclusions of law, the court found that plaintiff was entitled to judgment setting aside and vacating the decree of divorce dissolving the bonds of matrimony between her and defendant William L. Barteau; also annulling and cancelling the conveyance to Mary Bailey of such of plaintiff's real property as still remained in her name, and directing that an accounting between the plaintiff and defendants be had by a referee, to be appointed for that purpose.

There are but two questions which we find necessary to consider, viz.: *First*, whether the decision of the court annulling the decree of divorce between plaintiff and William L. Barteau was within or responsive to any issue in the case; and, *second*, whether the findings of fact, as to the fraudulent character of the conveyances to Mary Bailey, were justified by the evidence. We are clearly of opinion that both must be answered in the negative. The complaint was clearly not framed with a view to having the decree of divorce vacated. It does not contain the necessary allegations of fact. There is not a suggestion of its invalidity, unless it is by the application of the epithet "pretended." Neither is it any part of the relief asked, unless covered by the general prayer. The gist of the action was the alleged fraudulent transfer of plaintiff's property to the defendant Mary Barteau, or Bailey, and the object was to recover the property, or its proceeds. The annulment of the decree of divorce was not a part of, or at all necessary to, the fullest relief to plaintiff as to her property rights. Those rights could be as effectually protected and enforced with the decree of divorce standing as if vacated. Neither was the case tried by counsel upon the theory that the question of the validity of the divorce was in issue. The opening of the case by plaintiff's counsel clearly shows this; and, again, when the trial of the case was far advanced, he objected to the introduction of certain evidence bearing upon the divorce, remarking, "We can't try that divorce suit over again." The allegations in the complaint with

reference to the divorce were evidently made only in aid and explanatory of the charge of the fraudulent transfer of the property, and not as independent allegations for the purpose of having the decree vacated. It is true that much evidence was introduced regarding the history of the suit for divorce, but this was competent as bearing upon the alleged fraudulent conspiracy as to the property matters; and, being relevant on that issue, the fact that it was admitted without objection cannot be construed as a consent of parties to try another issue upon which it might also be relevant, but which was not within the issues made by the pleadings. The direction of the trial court ordering judgment vacating the decree of divorce was, therefore, unwarranted and erroneous.

2. There only remains to be considered the question whether the evidence justified the findings of the trial court as to the fraudulent character of the transfers of plaintiff's property to Mary Barteau by the other defendants. As our conclusion on this question is so entirely different from that of the learned trial judge, it is due to his recognized ability, keen sense of justice, and high moral standard, that we give at some length the reasons for the conclusion at which we have arrived. There are some things about the case that would perhaps naturally incline sympathy towards the plaintiff, and there are others that are not calculated to elevate the defendants Barteau in the opinion of the court. But suits must be decided according to established legal principles, and not on mere sentiment or according to some ideal moral basis, regardless of legal rules.

It appears from the evidence that plaintiff and William L. Barteau were married in 1873, she having some $3,000 in her own right, a considerable part of which she expended in buying furniture and other things necessary for housekeeping. She and her husband first lived for about a year in Appleton, Wis., where he owned and ran a flouring-mill, which he gave to his wife in consideration of his having had the benefit of her money. In 1874, they moved to St. Paul, and afterwards the mill was sold for some $8,000. Barteau here engaged in the lumber business, in which from $3,500 to $4,500 of the proceeds of the mill was invested and lost, the business proving a failure, and leaving Barteau insolvent, and so heavily indebted that he

has never since owned any property or carried on any business in his own name. In 1877, a real-estate purchase was made by Barteau for his wife, and, the property being sold at a profit, in the spring of 1878, Barteau and his wife, with part of the proceeds, took a trip to Europe, he returning in the spring of 1879, and she in the fall of the same year. From the time of his return, Barteau devoted himself to dealing in real estate, the capital used being what was left of his wife's money out of the Appleton mill. The business from this time on was transacted by him as his wife's agent and in her name. In 1882, plaintiff spent considerable part of her time east, returning in the fall of that year. By 1883, it is quite evident that an incompatibility between the two had developed, she having consulted two attorneys, Wilson and Barrett, regarding a separation. In fact, the two lived very little together as husband and wife after 1882. In the spring of 1883, she again went to Europe, returned in May, 1884, but went back to Europe in June of the same year. This was evidently intended and understood by both parties as a final separation, so far as any marital relations were concerned. She left everything in the way of business and property in his hands, and entirely to his management, to do as he pleased, he to remit to her monthly a sum of money to pay her expenses while abroad. To enable him to transact business she had previously given him a power of attorney, and before starting to Europe she executed a power of attorney to defendant Fairchild, to execute conveyances of real estate in her name. This was evidently intended merely to facilitate the transfers of real property by her husband. It is quite clear that Fairchild was not expected to handle or manage any of the property, but this was to be done, as before, exclusively by her husband. After she left, her husband continued the real-estate business in her name as before, deeds and mortgages being taken and given, and notes executed by him in her name; Fairchild, whenever necessary, executing deeds for her; her husband, with more or less regularity, remitting to her from $75 to $125 per month. This was the condition of affairs when, about September 1, 1885, the correspondence by letters put in evidence commenced. The oral testimony of the parties as to subsequent events is evidently much colored by both feeling

and self-interest, but these letters, written as they were when the parties said what they felt without any temptation to misrepresent, accurately photograph the entire situation.

The correspondence opens with a letter from Barrett to plaintiff, dated August 31, 1885, inclosed in a letter from her husband to her, dated September 2d.   Barrett was her husband's attorney, and also an old acquaintance and friend of herself.   While plaintiff denies some of Barrett's statements in the letter, as to what had previously transpired between himself and her, yet the letter is important as showing the basis upon which negotiations were opened with reference to a settlement of property matters, and as showing what facts were then communicated to the plaintiff.   In this letter, Barrett refers to her conversation with him the Sunday before she left St. Paul, in which she had expressed a desire to have the marital relations between herself and Barteau dissolved, and states, as his conclusion, that it would be unwise and unjust to both to defer full, final, and legal separation; and then suggests that a divorce could most easily be obtained by Mr. Barteau on the ground of desertion, and states that he has prepared the necessary complaint, which he incloses, with instructions to her how to acknowledge service of it.   He then proceeds to the question of property, saying it was unnecessary to tell her that every dollar's worth of property owned by her and her husband was in her name; that to adjust these matters satisfactorily, and secure the property against Barteau's creditors, would require careful consideration, as Barteau could not hold anything in his own name.   Then he says: "To carry out what you informed me was your desire in the matter—viz., that Mr. Barteau should have all the property, and pay you a monthly allowance so long as you may wish it—will require a deed of conveyance of all the real estate standing in your name, and a bill of sale of all the personal property owned by you, from you to some person to be designated by him."   He then states that such deeds and transfers will be prepared and inclosed for her to sign, and adds an assurance that whatever monthly allowance Barteau should promise her would be promptly remitted.   The letter from Barteau in which this was inclosed, contained the "divorce papers," and says that Barrett at first thought it would be necessary

to prepare and send deeds of the property for her to sign; but, on his attention being called to the power of attorney from her to Fairchild, had concluded it was not necessary to put her to the trouble.    He then states that he had the deed drawn to Mr. Willius; and, in reference to the allowance, he says he will send her the $75 per month, and sometimes $100, "so you will be just as well off at any rate, and it will be better for me, as I can look at a lady without causing remarks, and I may find a girl I can marry."   The plaintiff, having been, as she says, ill, did not answer these communications until November 21st, when she wrote to Barrett a long letter, in which, referring to what he stated she had told him regarding a divorce, she says she does not remember her exact words, but that she knows that the object of her interview with him was concerning the dissolution, not of the marital, but the material relations; that what she wanted to ascertain on that visit was whether there was any way of dividing the property they possessed into two equal parts, one to be given over to her, and the other to be kept by Mr. Barteau, to do with as he might think best; that, if this could not be done, she had been then willing that he should keep it all, but that "these latter circumstances of his taking another wife, which is to take place, he writes me, at once after obtaining the divorce," alter matters.    She then at great length, and in a manner which shows her to be a woman of intelligence and keen perception, "run Barrett hard," as her husband afterwards expressed it, upon the one-sided and unbusiness-like character of the proposition that she should surrender all her rights to the property, and rely solely on the promise of Barteau to make her remittances, which failure in business might make him unable to pay, or which the influence of his new wife over him might make him unwilling to pay; that she did not wish to be dependent upon the bounty of the husband of another woman.    But she adds: "I quite agree with your advice (especially since I received Mr. Barteau's two last letters) that the divorce be full and final, and a legal separation; and *thus let it be with the property.*"

These letters are significant, in this: that they show that she knew that Barteau wanted a divorce in order to marry again, and that she was as willing that he should have it as he was desirous of obtaining

it; also that negotiations regarding the property were opened by his proposition that he was to have it all, and make her a monthly allowance in cash, and that, as he could hold nothing in his own name, it would have to be deeded over- to a third party.

The subsequent correspondence in evidence is fragmentary, many of the letters having been lost, but enough remains to characterize the whole transaction. Defendant Fairchild, in a letter to plaintiff, written December 1st, evidently in answer to one she had written him, says, while he has full confidence that Barteau would pay the amounts he promised, yet it would be more business-like to make over "the Wacouta-St. property" to her; that she has a right to be secured. In a letter written to her by Barteau on December 1st, he calls her attention to the difficulty of dividing the property, as it was all mortgaged, the Wacouta-Street property for $20,000. He then suggests selling the property to a third person, and she taking a mortgage on it for $12,500, with interest at 8 per cent., payable every three months; that this would insure her $1,000 a year, without trusting him at all. He further says that "it is a question whether we are worth $25,000 in cash," and, if she had one-half of this in money, she could not realize over 6 per cent. on it.

The plaintiff, evidently not being satisfied to trust her interests to Barrett in view of the unbusiness-like character of his proposition, and the further fact of his being her husband's attorney, and apparently also thinking that Fairchild was too friendly with her husband to be intrusted entirely with her interests, concluded to employ other counsel in St. Paul. She consequently, on December 11th, wrote to Mr. Henry A. Wilson with directions that, if he was no longer in St. Paul, the letter should be delivered to John W. White. As Mr. Wilson had died, the letter went to Mr. White, who thereafter acted for the plaintiff in settling and adjusting matters with reference to the property. In this communication she inclosed and commented on the letters of Barrett and her husband, and, after referring somewhat to the cause of the difficulties between her and her husband, and attributing them to his misconduct and abuse, adds: "But, as I do not have to take an oath, I will sign the divorce paper, if he will have me comfortably provided for *first*." "I am not willing to be at

the mercy of any second woman." Also: "Let them know that I could hold, as I have for years, all the property, but that you are going to have half, and a good settlement for me; and it can be put into some good man's hands for me. It must be separate from this new wife's hands and influence." She also refers to the different pieces of property in her name, and says she knows "there is $25,000 clear." Also: "You will see he wishes to marry at once, and I am ready to do all I can for his comfort and happiness; but where we differ is that before he takes another wife it seems better for me to be disposed of. * * * I want a division of all our belongings, and one-half, or its equivalent, handed over to you for me." In another letter to the same person, the date of which does not appear, she suggests, by way of settlement, the sale of the property to some third person, and giving her a mortgage on it for $20,000, at $7\frac{1}{4}$ per cent. interest. In a third letter, dated December 20th, she repeats the same suggestion. Mr. White, on receipt of these communications, as requested, cabled his acceptance of the employment, and, on December 29th, wrote plaintiff to the same effect. It seems that, in these letters to Wilson or White, plaintiff had inclosed the "divorce papers," with her acknowledgment of service, but with instructions not to deliver them to Barteau until the matter of the property was satisfactorily settled. In a letter to Mr. White, dated December 31st, plaintiff says: "I should never have asked for this divorce, although I told him and Mr. Barrett it was the best thing for him." Also: "It will not be necessary for them to know that I have told you very much, only that a divorce is to be, and that I wish to be provided for before it takes place." Also: "I wrote to him [Fairchild] I wished for half what there was, * * * and the sale to be made to a third person, so that I shall have a mortgage of $20,000." And in another letter she writes: "When all is settled you will see that Mr. Barteau has these papers [the divorce papers, with her acknowledgment of service] giving him his freedom from me." On January 11, 1886, Barteau himself wrote plaintiff, among other things: "But I want you to be satisfied, and will make mortgage $15,000, at 8 per cent., which will give you $1,200 a year. You have employed John W. White, and he is waiting to hear from you."

On January 14, 1886, plaintiff wrote to Mr. White, acknowledging receipt of his letter, and saying: "I leave it all in your hands. * * * You will do as you wish and think best in all these matters. You need not consult with me, for I trust you." And again, on January 16th: "I have written to Mr. Fairchild; do as you believe to be best for me." On January 29th, after receipt of letters from Barteau and Fairchild, the plaintiff again writes Mr. White: "I tell Mr. Barteau, in my letter to him to-day, that I have left all to you, and that you are to act for me as is just and right. * * * See that there are no 'ifs' or 'ands,' no leaving to his heirs, but that everything is mine, absolutely and forever. I will not let the divorce be granted on any other terms."

In the mean time, Mr. White went to work to look up the property, to ascertain what there was, and what condition it was in, and its value. He did not care to rely on Barteau's statements, and hence did not ask him much about it, but investigated for himself. He found it in bad condition to handle, or to get anything out of it. It was all quite heavily mortgaged, and hence in no condition to be divided to advantage, and, if divided, in no desirable condition for plaintiff to take and manage, as what she needed was something that would bring in a regular income for her support. There is not a particle of evidence to suggest a doubt as to the ability as well as integrity of Mr. White's investigations or conclusions. It is suggested that he was not aware of the existence of some $13,000 mortgages and other securities received on land sales and land contracts, and that Barteau did not disclose their existence to White. But Barteau was not asked about them, and it is not claimed that he did not answer correctly all inquiries put to him regarding the property. Mr. White himself disclaims relying on Barteau's statements. Moreover, had the existence of these securities been known, and they taken into the account, they could not have aided plaintiff, as they were all hypothecated as security for an indebtedness of some $16,000, personal obligations, which plaintiff owed in bank. From a careful perusal of all the evidence, we think it shows that at this time there was property in the name of plaintiff, including these securities, of the value

of perhaps $70,000 or $75,000, with incumbrances on it, including the indebtedness to the bank, of about $50,000.

While plaintiff herself probably did not know anything about details, yet she evidently knew, in a general way, what the property consisted of, and the condition it was in, for she testified: "It was mortgaged here and mortgaged there, and that is the reason I couldn't do anything with it." In the negotiations between White and Barteau, the latter proposed giving a mortgage on what is called the "Wacouta-Street Property," much the most valuable and desirable of the whole. On March 2d Mr. White wrote to plaintiff regarding this: "His proposition was, in short, to place a second mortgage on the Wacouta-St. property, or rath'er to sell it to some party, (Mary Bailey, for instance,) who would give back a mortgage for $15,000, at 8 per cent., payable quarterly." This offer he expresses himself as considering one-sided, for the reason that the property was already heavily mortgaged, and, if Mary Bailey should fail to pay the interest, the plaintiff would have to foreclose; that his idea was to sell the Wacouta-Street property, and get the amount over and above the incumbrances out of it in cash. Finding, however, as he testifies, that no such sale could be effected, as no one could be found that would take the property subject to incumbrances, and pay $15,000 in cash, he finally concluded an arrangement, by which Barteau was to pay $5,000 of the incumbrances, so as to make plaintiff's security that much better, and then to give, or cause to be given, to her a mortgage on the property for $15,000, bearing interest at 8 per cent. per annum, payable monthly. This settlement having been agreed upon, Fairchild thereupon, under his power of attorney from plaintiff, conveyed all the real estate to Mary Bailey, subject to incumbrances, which she assumed and agreed to pay, and Mary Bailey then executed to plaintiff a mortgage on the Wacouta-Street property for $15,000, as agreed on. That Mr. White accepted this in behalf of his client in full settlement of the whole matter, and in lieu of all her property interests, which were then to go to Barteau, is evident from the whole history of the negotiations. Barteau, also, under his power of attorney, assigned to Mary Bailey all the personal securities standing in

plaintiff's name; and White delivered over the divorce papers, with plaintiff's admission of service, to Barteau, who proceeded to obtain a divorce, and to marry Mary Bailey a few days afterwards. On March 15, 1886, almost immediately after the settlement was closed, Mr. White, by letter, fully advised his client of the terms of the settlement, and of his reasons for accepting it as the best thing that could be done under the circumstances. He also, for some time, attended to collecting and remitting to plaintiff the monthly instalments of interest on the mortgage; but it was finally arranged that she should draw directly on Barteau for them. The plaintiff evidently knew all about the settlement, and also the fact of the transfers of the property to Mary Bailey; for, in October, 1886, she wrote Barteau a long and apparently friendly letter, informing him that his creditors were attempting to find out from her facts to enable them to reach the property for their debts. No word of objection or complaint as to what had been done seems to have been made by plaintiff until after the receipt by her of a letter written by Barteau in May, 1888, (as much lacking in business judgment as it is in delicacy or a sense of justice,) in which he informs her that he will not be able thereafter to pay more than $75 per month; and, referring to a report that she was about to be married again, expresses a hope that it is true, and that, if married, she would release him altogether from these monthly payments. And even then her expressions of dissatisfaction were not regarding the terms of the settlement, but at Barteau's attempted repudiation of them.

Whatever may be thought of the conduct of some of the parties in some other matters, we are utterly unable to find any evidence of any actionable fraud against plaintiff as to these property matters, which is the only thing involved in this case. She was as willing as her husband was anxious for a legal separation. She recognized evidently that, while all the property was in her name and was legally hers, yet her husband had at least some equitable claims to a share of it. She wanted, however, to be sure that her part should be absolutely secured to her before the divorce should be obtained by her husband. She carefully employed competent counsel, to whose judgment she intrusted her interests, with authority to make such a set-

tlement as they deemed best, subject only to some general limitations. Her first suggestion was to have the property divided equally between them. Its condition rendering this impracticable, she then suggests a mortgage for $20,000. Her husband offers to her attorney one for $12,500, and finally one for $15,000, which her attorney accepts as the best thing for her under the circumstances, and informs her what he had done. For two years and a half she makes no objection, but draws her monthly instalments of interest. No fraud, or even mistake, on part of her attorney is suggested, and we can see no reason to doubt the soundness of his judgment in making the settlement he did. The plaintiff must have known that the understanding was that all the property, except such as was secured to her, whether in the form of a mortgage or of specific real estate, was to go to Barteau. Neither Barteau nor Fairchild was ever called on for an inventory of the property, or for an accounting; and it is evident that it was never intended or expected that the settlement should be made on any such basis. The parties knew approximately what the amount of the property was, and the object was to obtain for plaintiff a certain round or lump sum without going into the details of an inventory.

Much is said about plaintiff's sickness and consequent inability to transact or understand business affairs. The evidence does not justify this claim. While she was doubtless in impaired health and sometimes quite sick, yet her letters show that her mental faculties were not impaired. Those letters show her to be a women of intelligence and keen perceptions. While not versed in the practical details of business, she displays a marked business shrewdness, that enabled her to take in the merits or demerits of a business proposition with a clearness and accuracy not often equalled by her sex. Moreover, she employed counsel to look after her interests for her, with the result of whose services she remained apparently entirely satisfied for nearly three years.

Some point is made of the fact that before the settlement was consummated, and before Barteau got his divorce, he commenced to invest some of plaintiff's property in the name of Mary Bailey. It is true he did do so to some extent, undoubtedly anticipating that the settlement with plaintiff would be made, and he obtain his divorce,

and then marry Mary Bailey, in whose name he would then keep all the property, and do all his business, just as he had previously done it in plaintiff's name. It was in the same line as his changing the bank-account from plaintiff's name to that of Mary Barteau, as soon as he had married her. Such conduct is certainly repulsive to any person entertaining correct views of the sacredness of the marriage relation; but we cannot see how, under the circumstances, this constitutes any legal fraud on the plaintiff. Whatever wrong may have been committed was certainly not on the plaintiff, but against the divorce laws of the state,—a matter not involved in this case.

Order reversed.

NOTE. A motion for a reargument of this case was denied January 27, 1891.